UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------------x
KF and AF, as parents on behalf of their infant    :
daughter CF,                                       :
                                                   :
        Plaintiffs,                                :
                                                   :    OPINION AND ORDER
             v.                                    :
                                                   :    12-CV-2200 (ER)
                                                   :
MONROE WOODBURY CENTRAL SCHOOL                     :
DISTRICT and DAVID BERNSLEY, High School           :
Principal, in his individual and official capacities, :
                                                   :
        Defendants.                                :
----------------------------------------------------------------x
```

RAMOS, D.J.:

On March 27, 2012, Plaintiffs filed an Order to Show Cause for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, seeking placement of CF, a student at Monroe-Woodbury High School, in an out-of-district public high school within Orange County.[1] Oral argument was held before the Court on April 3, 2012. For the reasons set forth below, Plaintiffs' application for a preliminary injunction is DENIED.

I.   FACTUAL BACKGROUND

CF, a fifteen year-old girl, has attended public schools within the Monroe-Woodbury Central School District since she was in kindergarten. (Pls.' Mem. in Supp. of Prelim. Inj. at 1.) In April 2010, when CF was in the eighth grade, she alleges that a male classmate sexually assaulted her in a classroom in the middle school she was attending. (CF Aff. ¶ 7.) CF did not

---

[1] At oral argument, Plaintiffs acknowledged that the Court could not grant the particular relief requested in their moving papers, as no other school district was a party to this action. Instead, they amended their request to require Defendants to undertake "best efforts" to enter into an agreement with another school district to accept CF. (Tr. at 29.)

1

report the incident to any of the middle school's teachers or administrators. (*Id.*) As a result of the incident, CF alleges that she was subjected to taunting and teasing by other students, which caused her to experience anxiety and to engage in self-harm. (*Id.* ¶ 8; Pls.' Mem. in Supp. of Prelim. Inj. at 2.)

In September 2010, CF started attending the Monroe-Woodbury High School. (CF Aff. ¶ 10.) Prior to the start of the school year, her mother, KF, met with Guidance Counselor Hogaboom and Assistant Principal Martin to express her concerns about CF's transition to high school.[2] (KF Aff. ¶¶ 6, 9; Kleinman Aff. ¶ 12.) Martin assured her that he would speak to the school social worker about CF. (KF Aff. ¶ 8.)

Approximately three months later, in November of her freshman year, CF alleges that another student sexually assaulted her in the hallway while they were changing classes. (CF Aff. ¶ 12; Kleinman Aff. ¶¶ 15-16.) Although she met with District Social Worker Carney on at least two occasions in the fall of 2010,[3] CF told no one at the school about the purported sexual assault. (CF Aff. ¶ 13 at 4.)

After the second sexual assault, CF's psychological condition worsened and she began to attend school less frequently. (Pls.' Mem. in Supp. of Prelim. Inj. at 3; CF Aff. ¶ 13 at 4.) In January 2011, CF developed mononucleosis. (Kleinman Aff. ¶ 18.) As a result, she did not attend classes at the high school and the district provided her with home-tutoring for six weeks.

---

[2] The parties dispute what was discussed at this meeting. Plaintiffs state that KF informed Assistant Principal Martin of CF's self-injurious behavior, that rumors of a sexual nature had circulated about CF, and that other students were taunting her. (KF Aff. ¶¶ 6-7.) Defendants assert, however, that KF discussed CF's anxiety about the transition to high school at that meeting, and that the school district did not become aware of CF's self-injurious behavior until March 2011, when she informed Guidance Counselor Hogaboom. (Kleinman Aff. ¶¶ 12, 20.)

[3] Again, the parties dispute on how many occasions CF met with the school social worker. Plaintiffs contend that despite Mr. Martin's assurance that he would inform the social worker of CF's "at risk" condition, the social worker only met with CF twice in the fall of 2010. (KF Aff. ¶ 8.) The school district's records indicate, however, that the school social worker counseled CF approximately five to eight times in the fall of 2010. (Kleinman Aff. ¶ 17, Ex. C.)

(KF Aff. ¶ 11.) In March 2011, she attempted to begin attending school once again. (Kleinman Aff. ¶ 19.) CF reported that she began to suffer regular migraine headaches, became emotionally overwhelmed, and experienced depression and anxiety while at school. (CF Aff. ¶ 15 at 4.) Eventually, it proved to be too emotionally challenging and CF returned to home-tutoring for the remainder of the 2010-2011 school year. (*Id.* ¶ 16 at 5.)

CF and KF met with Assistant Principal Martin and Counselor Hogaboom before the start of the 2011-2012 school year to discuss CF's progress. (Kleinman Aff. ¶ 23.) Based on that meeting, it was agreed that CF would attend classes at the high school on a modified schedule. (*Id.* ¶ 24; CF Aff. ¶ 17 at 5.) The school district also provided CF with an adaptive physical education program, normally offered only to special education students, and offered to place CF in the "Academy," a small-group after school program. (Kleinman Aff. ¶¶ 25-26.) Again, attending the high school regularly caused her to become emotionally overwhelmed and to engage in self-injurious behavior. (CF Aff. ¶ 17 at 5.) In September 2011, she was found by a school monitor cutting herself in the school building. (Kleinman Aff. ¶ 27.) The school nurse and social worker met to discuss the issue with her and the school district confirmed that she was receiving private counseling services. (*Id.* ¶ 28.) After this meeting and at the suggestion of the school social worker, she left the high school and attended a thirty-day Intensive Day Treatment Program. (CF Aff. ¶¶ 17-18 at 5.)

At some point while in attendance at the Intensive Day Treatment Program, in October 2011, CF revealed to a nurse practitioner and a therapist that she had been sexually assaulted in the eighth and ninth grades by other students. (Kleinman Aff. ¶ 32.) Soon thereafter, for the first

time, CF informed school officials of the two sexual assaults.[4]  Upon learning of the alleged assaults, Vice Principal Martin spoke with the middle school assistant principal about the assault that occurred while CF was in the eighth grade and interviewed the boy alleged to have committed that assault.  (*Id.* ¶ 30.)  Martin also confirmed that CF was not in any classes with him.  (*Id.*)  Martin did not inform CF's parents of any details of his efforts to investigate the earlier incident, other than that he had called the boy to his office.  (KF Aff. ¶ 16.)  In addition, Martin determined that the boy alleged to have committed the second sexual assault no longer attended the high school and advised CF and her parents that they could file a police report, which they declined to do.  (Kleinman Aff. ¶¶ 36-37.)

At the request of CF's parents, the school district tested CF for special education eligibility in November and December 2011.  (*Id.* ¶¶ 33-34, 38.)  At a hearing on December 8, 2011, with CF's parents present, the school district's committee on special education found that CF was ineligible for special education, and ordered a psychiatric evaluation to determine the best course of action for her.  (*Id.* ¶¶ 38-40.)  The committee also recommended that CF first attend tutoring at the Harriman Center and later attend an alternative high school environment. (*Id.* ¶ 41.)

Principal Bernsley met with CF and her parents on December 13, 2011, before the school psychiatrist's evaluation of CF.  (KF Aff.  ¶ 22.)  CF described the two alleged sexual assaults to him, and he stated his intent to look into what options would be available to her going forward. (*Id.*)  The school district provided CF with a psychiatric evaluation on the same day, at which the

---

[4] Plaintiffs'' and Defendants' papers allege different dates on which the school district was notified of the sexual assaults.  Defendants' position is that CF informed the vice principal of the first sexual assault on September 28, 2011, and of the second sexual assault on November 4, 2011. (Kleinman Aff. ¶¶ 29, 35). Plaintiffs, however, state that at some point after the first week of October, 2011, CF informed the school district of both sexual assaults at a meeting with the vice principal, guidance counselor, and social worker the day after CF first disclosed the sexual assaults to a nurse practitioner and therapist at the Intensive Day Treatment Program. (CF Aff. ¶ 15 at 5-6; KF Aff. ¶ 13.)

4

psychiatrist diagnosed CF with Anxiety Disorder and recommended that she work with a personal therapist towards returning to a traditional school environment. (Kleinman Aff. ¶¶ 44-46.)

On January 12, 2012, the committee on special education met to discuss the results of the psychiatrist's report. (*Id.* ¶ 48.) CF and her parents were also present at this meeting. (*Id.*) The committee recommended placing CF in the GO Program, an alternative high school. (*Id.* ¶ 50.) CF's parents agreed to CF's placement in the GO Program, but CF attended for only one day and felt too uncomfortable there to return. (*Id.* ¶¶ 50-51.) The school district then resumed providing CF with ten hours of home instruction per week at the Harriman Center. (*Id.* ¶ 57.)

The school district convened a meeting of its Section 504 Accommodation Team on February 3, 2012, to develop a plan for CF. (*Id.* ¶ 58.) CF's parents were present. (*Id.* ¶ 59.) With the goal of placing CF in the least restrictive environment possible, the Accommodation Team considered various options, including placing CF in a tutoring program at the Harriman Center, the assignment of a one-on-one monitor to shadow CF in order to ensure her comfort and safety while at school, additional time for testing, in-school counseling, and the GO Program. (*Id.* ¶¶ 62-63.) CF's parents rejected each of these recommendations; they insisted that CF be placed in another public high school located outside the district. (*Id.* ¶¶ 55, 66.)

Principal Bernsley met with CF's parents on February 1, 2012, and he notified them by letter dated February 9, 2012, that they could file a grievance with the school district's Title IX officers. (*Id.* ¶¶ 53-54.) Her parents did not file a grievance. (*Id.* ¶ 69.) However, the school district's Title IX officer initiated an investigation shortly after the February 9 letter was sent, by interviewing the two boys alleged to have committed the assaults, as well as school staff members. (*Id.* ¶¶ 70-78, Ex. E ¶ 4.) Plaintiffs initiated this action before the Title IX

investigation was concluded. (*Id.* ¶ 79.) The district's Title IX investigation is still ongoing. (*Id.* ¶ 80.)

## II. DISCUSSION

Plaintiffs have sought a preliminary injunction on the basis of Title IX of the Civil Rights Act of 1964, which states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). It is well settled that Title IX contains an implied private right of action for plaintiffs who bring suit against educational institutions that receive federal funding, and liability may be imposed upon a school district for both injunctive relief and monetary damages if it is found to be in violation of this law. *Davis v. Monroe Cty. Bd. of Ed.*, 526 U.S. 629, 639 (1999); *Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60, 71-73 (1992); *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009). It is also clearly established that sexual harassment in the educational context—whether teacher-on-student or student-on-student—may constitute a violation of Title IX. *Davis*, 526 U.S. at 643.

A school district may be found liable for student-on-student harassment if a plaintiff can establish the following four elements:

(1) the school district is a Title IX funding recipient;

(2) an appropriate person has actual knowledge of the discrimination or harassment the plaintiff alleges occurred;

(3) the funding recipient has acted with deliberate indifference; and

(4) the discrimination is so severe, pervasive and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit.

*McGrath v. Dominican Coll. of Blauvelt,* 672 F. Supp.2d 477, 486 (S.D.N.Y. 2009), citing *Williams v. Bd. of Regents of the Univ. Sys. of Georgia,* 477 F.3d 1282, 1293 (11th Cir. 2007).

The first and second elements are not in dispute. It is Plaintiffs' position that Defendants were deliberately indifferent to her allegations and to her claims that the harassment created a hostile educational environment. They claim, in essence, that due to the sexual assaults CF endured in the Monroe-Woodbury Central School District, she became unable to attend school without experiencing psychological harm. Plaintiffs argue that, in order to remedy her deprivation of the benefits of a public education, Defendants should now be obligated to attempt to place CF in another, out-of-district public high school within Orange County.

A.  <u>Standard of Review</u>

"In general, the district court may grant a preliminary injunction if the moving party establishes (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." *Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989) (citations omitted). If a party seeks a mandatory injunction—i.e., one "that alters the status quo by commanding a positive act"—then in addition to showing an irreparable injury, the moving party is required to meet the more stringent of the two alternative tests: a likelihood of success on the merits. *D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006) *opinion amended on denial of reh'g*, 480 F.3d 138 (2d Cir. 2007) (citation omitted). Meeting this higher standard is "especially appropriate when a preliminary injunction is sought against [the] government." *Id.* (citing *Mastrovincenzo v. City of New York,* 435 F.3d 78, 89 (2d Cir. 2006)).

B. <u>Irreparable Harm</u>

A party seeking a preliminary injunction must demonstrate that it will suffer irreparable harm if the injunction is not issued. In order to do so, a party must prove harm that is "actual and imminent." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (citation omitted). The harm may be "neither remote nor speculative . . . [nor] one that [can] be remedied if a court waits until the end of trial to resolve the harm." *Id.* (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234-35 (2d Cir. 1999) (internal quotation marks omitted)).

Plaintiffs assert that CF is currently suffering irreparable harm by being denied the benefits of a "normal high school experience." (Pls.' Reply Mem. at 13.) They further assert that this harm cannot be remedied by regular, full-time placement in Monroe-Woodbury High School because of her psychological "incapacity" to function in the school as a result of the sexual harassment and teasing she was subjected to in the past. (*Id.* at 12.) Thus, according to Plaintiffs, *any* effectual remedy *cannot* include either a requirement that CF attend Monroe-Woodbury High School or placement in an alternative environment that does not qualify as a "normal" high school. Plaintiffs are unable to establish that CF will suffer irreparable harm for two reasons: (1) they affirmatively rejected a number of options offered by the school district to remedy the violation, thus rendering the alleged harm to be speculative; and (2) they delayed bringing their action for injunctive relief for nearly 6 months, thus negating the existence of imminent harm.

At the outset, and contrary to Plaintiffs' contention, Title IX does not compel educational institutions that receive federal funds to provide students with a "normal" school experience. Indeed, Title IX does not prescribe any particular educational experience at all. Rather, Title IX merely prohibits schools from excluding anyone, on the basis of sex, from participating in an

educational program that receives federal assistance, or from denying the benefits of such programs on the basis of sex. 20 U.S.C. § 1681(a); *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 286 (1989) (principal objectives of Congress in enacting Title IX were to "avoid the use of federal resources to support discriminatory practices and to provide individual citizens effective protection against those practices"). If a Title IX violation premised on student-on-student harassment is proven, school districts are not constrained in their ability to fashion appropriate relief, but rather they retain broad flexibility to respond in any manner that is not "clearly unreasonable." *Davis,* 526 U.S. at 648.

Here, even assuming, *arguendo,* that the harassment CF was subjected to constituted "harassment that [was] so severe, pervasive and objectively offensive that it effectively [barred] [CF's] access to an educational opportunity or benefit," *Davis*, 526 U.S. at 633, the school district has provided Plaintiffs accommodations, and has otherwise offered other options that, on their face, served to remediate the purported Title IX violation.[5] For example, Defendants offered to assign a one-on-one monitor "to shadow CF and ensure her comfort and safety" at all times while she attended school, to enroll CF in an alternative educational environment—the GO Program, to enroll CF in a tutoring program in a section of the high school that is separated from the general population, and to provide CF with in-school counseling. (Kleinman Aff. ¶¶ 50, 63.)

---

[5] There appears to be no dispute that CF does suffer from an anxiety disorder, which "substantially limit[s] her ability to attend school." (Kleinman Aff. ¶ 61.) The school district has so concluded and, indeed, has actively accommodated CF since prior to the February 3, 2012 diagnosis of this disorder. But as Defendants point out at length in their memorandum in opposition to this application, the appropriate vehicle for relief for CF's condition is not Title IX, but rather the Individuals with Disabilities Education Act (IDEA), which requires states receiving federal funds to ensure that a "free appropriate public education is available to all children with disabilities." 20 U.S.C. § 1412(a)(1)(A). Exhaustion of administrative remedies is required before a plaintiff may bring a federal lawsuit pursuant to the IDEA. 20 U.S.C. §1415 (f)-(g). If a plaintiff seeks relief available under the IDEA, but brings an action pursuant to the U.S. Constitution or any federal law that protects the rights of children with disabilities, the exhaustion requirement remains in effect. *Id*. §1415 (l); *see also Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 246 (2d Cir. 2008) ("complainants must overcome [exhaustion] not only when they wish to file a suit under the IDEA itself, but also whenever they assert claims for relief *available* under the IDEA, regardless of the statutory basis of their complaint).

Plaintiffs' rejection of those options bars their entitlement to injunctive relief. *See, e.g., Davis,* 526 U.S. at 648 (stating that victims of peer harassment are not entitled to make particular remedial demands under Title IX); *Menbeck v. Katonah-Lewisboro Sch. Dist.*, 403 F. Supp. 2d 281, 284 (S.D.N.Y. 2005) (finding no irreparable harm, and denying an application for a preliminary injunction, where plaintiff sought to compel defendant school district to provide transportation to school, but where there were other means of transportation available that plaintiff had failed to utilize).

Delay in seeking a preliminary injunction may also negate a showing of irreparable harm because "the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief." *Habitat for Horses v. Salazar,* 745 F. Supp. 2d 438, 449 (S.D.N.Y. 2010) (citing *Tough Traveler, Ltd. v. Outbound Prods.,* 60 F.3d 964, 968 (2d Cir. 1995)). Plaintiffs bring this application for a preliminary injunction nearly six months after CF notified her parents and the school district of the sexual assaults. This delay further discredits Plaintiffs' notion that a preliminary injunction is necessary to prevent an irreparable harm to CF. *See, e.g.*, *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.,* 25 F.3d 119, 124 (2d Cir. 1994) ("[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights, and a delay in enforcement tends to indicate at least a reduced need for such drastic, speedy action") (citing *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (internal quotation marks omitted); *Gillette Co. v. Ed Pinaud, Inc.*, 178 F. Supp. 618, 622 (S.D.N.Y. 1959) ("[b]y sleeping on its rights a plaintiff demonstrates the lack of need for speedy action and cannot complain of the delay involved pending any final relief to which it may be entitled after a trial of all the issues); *Gidatex, S.r.L. v. Campaniello Imports,*

*Ltd.*, 13 F. Supp. 2d 417 (S.D.N.Y. 1998) (stating that courts generally decline to issue preliminary injunctions when there is an unexplained delay in excess of two months).

However, even assuming that Plaintiffs could establish that they would suffer irreparable harm, they cannot establish their entitlement to injunctive relief because they also cannot establish a likelihood of success on the merits.

C. <u>Likelihood of Success on the Merits</u>

For a school district to be held liable for sexual harassment, a plaintiff must demonstrate that the school acted with deliberate indifference to the sexual harassment, which further requires a showing that the school had actual knowledge of the sexual harassment and responded in a clearly unreasonable manner. *Davis*, 526 U.S. at 648-49. Plaintiffs appear to premise their "deliberate indifference" argument on two related but distinct grounds: (1) the inadequacy of the school district's investigation; and (2) the inefficacy of the proposed responses. A review of the school district's response in this case conclusively establishes that it was not deliberately indifferent.

Deliberate indifference must "at a minimum, cause [students] to undergo harassment or make them liable or vulnerable to it." *Davis*, 526 U.S. at 645 (internal quotation marks omitted). A school district will be found to have acted with deliberate indifference only where its "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Tyrell v. Seaford Union Free Sch. Dist.*, 792 F. Supp. 2d 601, 626 (E.D.N.Y. 2011) (citing *Davis*, 526 U.S. at 648). "Deliberate indifference requires something more than a proffer indicating the ultimate inadequacy of preventative and curative measures. Instead, the measures taken must be so inadequate that a degree of discriminatory intent may be inferred." *Id.* (internal citation and quotation marks omitted); s*ee also, Tesoriero v. Syosset Central School*

11

*District,* 382 F. Supp.2d 387, 398 (E.D.N.Y. 2005) (where an educational institution takes timely and reasonable measures to end harassment, even if the measures ultimately prove to be ineffective, it is not deliberately indifferent). Stated differently, liability under Title IX attaches where a school district, "either through grossly inadequate action or no action at all . . . effectively causes the student to encounter discrimination." *Ex rel. Hunter v. Barnstable School Committee*, 456 F. Supp.2d 255, 265 (D. Mass. 2006) (citation omitted); *see also, Tesoriero,* 382 F. Supp.2d at 398 (Title IX recipients could be liable in damages only where their own deliberate indifference effectively caused the discrimination.).

1. Adequacy of the Investigation

Plaintiffs first contend that school district became obligated under Title IX to begin an investigation in August 2010, when KF first informed Vice Principal Martin that other students were spreading rumors "of a sexual nature" about CF. (Pls.' Mem. in Supp. of Prelim. Inj. at 11.) They assert that a school district's response to complaints of sexual harassment must be prompt and without "lengthy and unjustified delay" in order for a school district to negate liability under Title IX.[6] (*Id.*) They argue that Defendants failed to do so, and as such were deliberately indifferent to CF's complaints of sexual harassment. Even assuming, *arguendo*, that the August 2010 notification of teasing and taunting was sufficient to trigger a Title IX inquiry, *but see Tyrell*, 792 F. Supp. 2d at 628 (to find a Title IX violation, it is not enough to establish that a student has been "teased" or "called . . . offensive names") (quoting *Davis*, 526 U.S. at 652 (citations omitted)), the school district was not obligated to undertake any particular type of

---

[6] Citing the Revised Sexual Harassment Guidance issued by the Office of Civil Rights of the U.S. Department of Education, Plaintiffs assert that Defendants should have "take[n] immediate and appropriate steps to investigate or otherwise determine what occurred and take prompt and effective steps reasonably calculated to end the harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again." (Pls.' Mem. in Supp. of Prelim. Inj. at 11.) Plaintiffs' counsel conceded, however, that these guidelines have no precedential or other legal effect on this Court.

12

investigation in any particular manner. It was simply required to respond in a fashion that was "not clearly unreasonable" in light of the known circumstances. *Davis*, 526 U.S. at 649. This the school district clearly did.

Once the Defendants were notified of the alleged sexual assaults, they took numerous steps to investigate the allegations. First, immediately upon learning of the alleged assaults, Vice Principal Martin made sure that CF had no classes with the boy and spoke with the middle school assistant principal about the allegations. (Kleinman Aff. ¶ 30.) He also spoke to the boy about the assault. (*Id*.) Martin learned that the boy alleged to have committed the second assault no longer attended the high school. (*Id.* ¶ 36.) Soon thereafter, he advised CF and her parents that they could report the incident to the police, which they declined to do. (*Id.* ¶ 37.) In February 2012, Principal Bernsley told CF's parents they could file a formal grievance with the District's Title IX officers, and the school district initiated a Title IX investigation soon thereafter. (*Id.* ¶¶ 54, 69.) The Title IX officer interviewed school staff members, who had no knowledge of the incidents. (*Id.* ¶¶ 70-71.) The officer also interviewed the two boys alleged to have committed the acts. (*Id.* ¶¶ 73-78.)

Plaintiffs specifically complain that the formal Title IX investigation should have been initiated sooner than February 2012, and that the failure to do so constitutes deliberate indifference. Plaintiffs are mistaken. The school district was not required to proceed in a particular manner, even if there are policies in place that would appear to require the initiation of a formal investigation. *See, e.g., Oden v. Northern Marianas Coll.,* 440 F. 3d 1085, 1089 (9th Cir. 2006) (nine-month delay in convening a hearing in contravention of College policy requiring a hearing within thirty days of formal complaint of harassment did not amount to deliberate indifference); *McGrath*, 672 F. Supp. 2d at 489 (a failure to promulgate a Title IX grievance

procedure does not, in itself, constitute deliberate indifference) (citing *Gebser*, 524 U.S. at 291), *Tesoriero*, 382 F. Supp. 2d at 398 (where an educational institution takes timely and reasonable measures to end the harassment, it is not deliberately indifferent).

Importantly, even prior to initiating the Title IX investigation, at all times after CF notified the district about the assaults, the district apparently handled the matter as though Plaintiffs *had* established the existence of a hostile educational environment by making specific inquiries to ensure that CF would not come into contact with the two alleged violators. (Kleinman Aff. ¶¶ 30, 36.) As discussed below, measures to ensure, to the extent possible, physical separation of the violator and victim have been found to be a reasonable response to charges of sexual harassment.[7] To the extent that Plaintiffs complain that the alleged violators have not been expelled or otherwise disciplined, the Supreme Court has rejected the notion that particular disciplinary actions are required. *Davis*, 526 U.S. at 648 (quoting and disagreeing with respondent's contention that "a school district must immediately suspend or expel a student accused of sexual harassment").

2. Efficacy of the School District's Response

The Supreme Court stated clearly in *Davis* that "victims of peer harassment [do not] have a Title IX right to make particular remedial demands." *Davis*, 526 U.S. at 648. The school district in the instant case, upon being notified of the prior instances of harassment and CF's resulting anxiety, promptly met with her and her family and proposed a number of options to address her needs and concerns. Plaintiffs' rejection of these alternative options militates against a finding of deliberate indifference.

---

[7] *But see, Ex Rel. Hunter,* 456 F. Supp.2d at 264 ("It would unduly expand the coverage of Title IX protections to find that incidental interactions at a school between an alleged perpetrator and a victim constitute continuing acts of sexual harassment.").

As set forth above, in the days and weeks immediately after notification, the school district:

- offered to place CF in an adaptive physical education program and an after-school program (Kleinman Aff. ¶ 25-26);

- suggested that CF enter a 30-day Intensive Day Treatment program, as it believed the program would help her transition back into the high school after her extensive absences (*Id.* ¶ 31);

- upon the request of CF's parents, tested CF for her eligibility for special education in November 2011 (*Id.* ¶¶ 33-34);

- convened a hearing of the school's committee on special education on December 8, 2011, with CF's parents present, at which it was determined that CF was ineligible for special education services and recommended a psychiatric evaluation (*Id.* ¶¶ 38-40);

- the committee on special education also recommended relocating CF's home instruction to the Harriman Center and placing her in a general education alternative high school to help her transition back to Monroe-Woodbury High School (*Id.* ¶ 41);

- provided CF with a psychiatric evaluation on December 13, 2011, and the psychiatrist recommended that CF gradually transition back to a school environment while working with a personal therapist to develop healthy coping skills (*Id.* ¶¶ 44, 46);

- convened a hearing of the committee on special education on January 12, 2012, to discuss the results of the psychiatric report with CF and her parents, and recommended placing CF in the GO Program, an alternative high school, to which CF's parents agreed (*Id.* ¶¶ 48, 50);

- continued to provide her with ten hours of home instruction per week at the Harriman Center when CF and her parents deemed the GO Program unsuitable for CF (*Id.* ¶¶ 51, 57); and

- developed a "504 Accommodation Plan" on February 3, 2012, to help CF return to the high school; CF's parents were present at the meeting at which this plan was developed. (*Id.* ¶¶ 58-59.)  The district considered various accommodations that would assist CF in transitioning back into the high school, including tutoring at the Harriman Center, the assignment of a one-on-one monitor to ensure CF's comfort and safety at all times, additional time for testing, in-school counseling, and the GO program.  (*Id.* ¶¶ 62-63.)

The Court declines Plaintiffs' invitation to declare the accommodations and other alternatives offered by the school district insufficient as a matter of law to remedy the hostile educational environment of which they complain. The Supreme Court pointedly cautioned in *Davis* that courts should refrain from second-guessing the disciplinary decisions of school administrators. *Davis,* 526 U.S. at 648; *see also Gant v. Wallingford Board of Education,* 195 F.3d 134, 145 (2d Cir. 1999) ("The relevant inquiry . . . does not depend on whether one can plausibly 'second guess[] the disciplinary decisions made by school administrators.'").

In any event, these alternatives are entirely consistent with measures deemed appropriate by courts in similar situations.[8] *See, e.g., id.* (teacher, principal and superintendent were not deliberately indifferent to charges that child was being subjected to racial name-calling when record established that teacher had called a class meeting to discuss name-calling, told the students that name-calling was unacceptable and teacher resolved to "keep an open eye" on the situation); *Escue v. Northern OK Coll.,* 450 F.3d 1146 (10th Cir. 2006) (school not deliberately indifferent to allegations of sexual harassment where it permitted student to transfer out of professor's class and into one that was substantially similar, allowed student to stop taking one class and imposed grade as of that time mid-way through semester, and determined that relationship with professor would end after semester); *Oden*, 440 F. 3d at 1089 (school not deliberately indifferent to allegations of sexual harassment where immediately upon learning of allegations provided victim with two counselors to provide psychological and practical support, met with her more than a dozen times, assisted her in filing a formal complaint, and instructed

---

[8] These efforts are also consistent with the recommendations of the Office of Civil Rights of the United States Department of Education, Office of Civil Rights to remediate hostile educational environments in violation of Title IX, to which Plaintiffs cite in their moving papers. Title IX Guidance issued by the Department of Education provides that appropriate remedies for complaints of sexual assault in an educational environment include "providing an escort to ensure that the complainant can move safely between classes and activities; ensuring that the complainant and the alleged perpetrator do not attend the same classes; . . . providing counseling services; . . . [and] providing academic support services, such as tutoring." (Sussman Decl. Ex. 2 at 16.)

professor to have no contact with victim); *Marcum v. Bd. of Ed. of Bloom-Carroll Local Sch. Dist.,* 727 F. Supp. 2d 657 (S. D. Ohio 2010) (school not deliberately indifferent to victim of sexual assault on school bus where it took immediate steps to move violator to another bus so that victim would have no further contact with him, and victim was made to sit in front of the bus where she could be closely watched).

Moreover, crucial to a determination of whether the school district's response was not clearly unreasonable is the assessment of that response in the context of the "known circumstances." *Davis*, 526 U.S. at 649. In this regard, it is important to note that the information that CF provided concerning the sexual assaults was essentially historical in nature; the two assaults were alleged to have occurred approximately one year, and one and one-half years, respectively, prior to notification in the fall of 2011. *No* act of harassment is alleged to have occurred since November 2010, approximately one year prior to notification. Indeed, Plaintiffs acknowledge that what is currently preventing CF from attending Monroe-Woodbury High School is not an actively hostile educational environment, but rather the psychological effects of the alleged behavior to which she was previously subjected. As Plaintiffs' counsel stated at oral argument, "I can't make a statement as an officer of the court that, today, there is an actively hostile environment because the youngster is not associated today with the environment." (Tr. at 32.) Thus, the school district's focus on Plaintiffs' psychological needs after notification was perfectly reasonable under the known circumstances. While the Court does not fault the minor Plaintiff for failing to make a prompt report of the incidents she alleges caused the hostile environment, neither can the Court fault the school district for failing to promptly remedy a situation which no longer existed, if it ever did.

Finally, even if Defendants had acted with deliberate indifference, Plaintiffs have not proffered—nor has the Court found—any legal authority that supports their contention that this Court has the jurisdiction under Title IX to provide the specific injunctive relief they seek: placement of CF in a high school outside of Defendant's school district, or otherwise obligating the Defendant to engage in negotiations with other school districts in Orange County to procure placement of CF in another high school. This Court perceives no reason to afford such a remedy when it is unauthorized by the law under which Plaintiffs bring suit.[9]

### III. CONCLUSION

In accordance with the foregoing, Plaintiffs' application for a preliminary injunction is DENIED.

It is SO ORDERED.

Dated: April 30, 2012
White Plains, NY

_____
Edgardo Ramos, U.S.D.J.

---

[9] The remedy Plaintiffs seek, however, does appear to be available under the Individuals with Disabilities Education Act (IDEA). 20 U.S.C. § 1400 *et seq.* Since Plaintiffs did not exhaust their administrative remedies, as is required by the IDEA before bringing suit in the district courts, they would not qualify for such relief under that statute, either. 20 U.S.C. §1415 (f)-(g), (l). *See supra* n. 5.

18